# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

W. R. BERKLEY CORP.,

                Plaintiff,

        v.

CHRISTOPHER NOLAN,

                Defendant.

Civil Action No. 22-1537-GBW

---

Curtis J. Crowther, ROBINSON & COLE LLP, Wilmington, DE; Trevor L. Bradley, ROBINSON & COLE LLP, Stamford, CT.

    *Counsel for Plaintiff*

Kate Harmon, Noelle B. Torrice, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Wilmington, DE; J. Scott Humphrey, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Chicago, IL.

    *Counsel for Defendant*

## **OPINION**

October 29, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

On July 16, 2024 and July 17, 2024, this Court held a two-day bench trial on the claim of breach of contract brought by Plaintiff W. R. Berkley Corporation ("Plaintiff" or "Berkley") against Christopher Nolan ("Defendant" or "Mr. Nolan"). D.I. 33; D.I. 34. The parties have submitted post-trial briefing in the form of proposed findings of fact and conclusions of law. D.I. 32; D.I. 35.

Upon consideration of the trial record, including the trial testimony (*see* D.I. 33; D.I. 34), the exhibits introduced into evidence, and the stipulations of fact by the parties (*see* D.I. 27 at 14-20), and upon review of the parties' post-trial briefing (D.I. 32; D.I. 35), the Court concludes that Mr. Nolan breached his contracts. Below, the Court separately sets forth its findings of fact and conclusions of law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I.    FINDINGS OF FACT

### A.    Mr. Nolan's Employment With Berkley

1. Berkley is a Delaware corporation. D.I. 27 at 14.

2. Berkley Insurance is a wholly owned subsidiary of Berkley. D.I. 27 at 14.

3. The Berkley Surety Group operating unit ("Berkley Surety") of Berkley Insurance Company ("Berkley Insurance"), and not Berkley, employed Mr. Nolan. D.I. 27 at 14.

4. Berkley Surety employed Mr. Nolan from January 5, 2009 to December 31, 2021. D.I. 27 at 14; Ex. A, Berkley000001.

5. Berkley Surety issues surety bonds in two divisions, including contract surety and commercial surety. Ex. A, Berkley000001, Berkley000037-38.

6.  Berkley Surety issues surety bonds in both divisions between $50 million and $150 million. D.I. 32 at 2; D.I. 35 at 4-5.

7.  Berkley Surety issues surety bonds in both divisions in the United States and Canada.  Ex. A, Berkley000001, Berkley000037, Berkley000039.

8.  The surety divisions of Berkley Surety are two discrete business units with two separate infrastructures, at least "back in 2021."  D.I. 33, 7/16/2024 Trial Transcript Vol. I ("Trial Tr. Vol. I") at 170:24-171:6.

9.  Berkley Surety's contract division issues surety bonds to traditional contractors in a broad range of disciplines in the construction industry.  Ex. A, Berkley000039.

10. Once, and after Mr. Nolan resigned from Berkley Surety, Berkley Surety wrote a surety bond for $199 million.  Trial Tr. Vol. I at 88:4-16, 90:14-19, 92:5-8.

11. This was the only instance in which Berkley Surety wrote a surety bond in excess of $150 million.  Trial Tr. Vol. I at 88:4-16, 90:14-19, 92:5-8.

12. Berkley Surety has approval from the Department of Treasury to write contract and commercial surety bond programs up to approximately $515 million.  Ex. A, Berkley000038.

13. Berkley Surety's website states: "$150 Million Aggregate Program with the ability of higher limits for financially qualified accounts."  Ex. T.

14. If a client requests a surety bond program in excess of $400 million, Berkley Surety would decline such a request because Berkley Surety does not have the ability to handle a surety bond program of that size.  Trial Tr. Vol. I at 205:15-206:3, 209:2-9.

15. At the time he ended his employment with Berkley Surety, Mr. Nolan held the positions of Chief Risk Officer & Executive Vice President – Head of Commercial.  D.I. 27 at 14.

16. Mr. Nolan's home office with Berkley Surety was in New Jersey. Trial Tr. Vol. I at 230:13-19.

17. Mr. Nolan's responsibilities at Berkley Surety encompassed the entirety of the United States and Canada. Trial Tr. Vol. I at 130:17-21.

18. In his role as Executive Vice President – Head of Commercial, Mr. Nolan oversaw the entire commercial division. Trial Tr. Vol. I at 130:17-21. For example, he oversaw underwriting, had responsibilities for developing client relationships, and managed the business plan for the commercial surety division, the profit and loss center and the field staff. Ex. A, Berkley000022-23; Trial Tr. Vol. I at 193:23-194:3.

19. Mr. Nolan was never a leader in, never reported to anyone in, and never received reporting from anyone in, the contract division at Berkley Surety. Trial Tr. Vol. I at 196:16-25.

20. Consistent with Berkley Surety's general practice, during Mr. Nolan's tenure at Berkley Surety, the upper limit of Mr. Nolan's underwriting authority with respect to commercial surety bonds was $50 million for a single bond and $150 million for an aggregate bond program. Trial Tr. Vol. I at 206:10-16, 206:25-207:5.

21. In his role as Chief Risk Officer at Berkley Surety, Mr. Nolan had responsibilities in connection with both the contract surety and commercial surety divisions of Berkley Surety. Trial Tr. Vol. I at 122:21-25, 123:7-21, 168:11-24, 171:3-11, 234:21-235:1, 235:8-11.

22. The role of Chief Risk Officer was primarily an administrative duty. Trial Tr. Vol. I at 197:6-8.

23. The time Mr. Nolan spent performing his duties as Chief Risk Officer was minimal. Trial Tr. Vol. I at 200:13-15.

24. Mr. Nolan's only responsibilities as Chief Risk Officer was to provide a quarterly report about large risks and sporadic reports on probable losses. Trial Tr. Vol. I at 197:11-23, 198:23-199:4.

25. Mr. Nolan spent approximately 1.5 hours preparing each quarterly report, for a total of approximately six hours per year. Trial Tr. Vol. I at 200:13-22.

26. Ms. Farrell, one of the members of the Compensation Committee of Berkley's Board of Director's (the "Compensation Committee") (i.e., the Committee that determined that Mr. Nolan violated the terms of his RSU Agreements, as discussed below) was surprised at trial to learn that Mr. Nolan's time spent performing his duties as Chief Risk Officer was minimal. Trial Tr. Vol. I at 53:4-10.

27. Mr. Nolan had access to or received most of Berkley Surety's confidential information as to both commercial and contract surety bonds, including with respect to broker data, insured data, policy forms and wording, underwriting guidelines and procedures, strategy and vision documents, actuarial data, budget data, current and historical premiums, loss data, pricing models and formulas, benchmark rates, employee compensation and performance measures, information about proprietary computer systems or modeling programs, and information on related legal and compliance policies and matters. Ex. A, Berkley000025; Trial Tr. Vol. I at 150:23-151:23, 152:4-18, 155:4-11, 162:1-4, 244:20-23, 248:14-249:3, 249:8-19, 249:23-250:7, 263:21-25.

28. The whole commercial surety division generally had access to the same information. Trial Tr. Vol. I at 258:8-14, 265:23-266:1.

29. Some of the information that was considered confidential at Berkley Surety was publicly available, including:

a. Various bonds which were filed with public obligees and thus were available through public access records (Trial Tr. Vol. I at 258:17-259:4);

b. Historical premiums that were reported by the Surety Association (Trial Tr. Vol. I at 262:4-13); and

c. Benchmark rates that were filed with individual state insurance commissions and were thus publicly available (Trial Tr. Vol. I at 263:7-17).

**B.      The RSU Agreements**

30. To incentivize select employees and align their interests with Berkley's overall success and to protect Berkley's intellectual property interests, Berkley offers restricted stock units ("RSU shares") as a supplemental financial benefit. Ex. I, Berkley000582; Trial Tr. Vol. I at 19:4-20:10.

31. In exchange for the RSU shares, the RSU grantees promise to be bound by certain recapture provisions. *See, e.g.*, Ex. A, 2017 RSU Agreement, § 3(d), Berkley000048-49.

32. On or about July 19, 2010, Mr. Nolan executed and entered into an RSU Agreement with Berkley. D.I. 27 at 14.

33. Under the 2010 RSU Agreement, 2,250 split-adjusted shares vested on 7/19/2015 with a Settlement Date value of $55,755. D.I. 27 at 14.

34. On or about August 7, 2012, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 14.

35. Under the 2012 RSU Agreement, 1,687 split-adjusted shares vested on 8/7/2017 with a Settlement Date value of $51,335.41. D.I. 27 at 15.

36. On or about August 5, 2014, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 15.

37.  Mr. Nolan ultimately received 1,125 shares of common stock of Berkley pursuant to the 2014 RSU Agreement, after adjusting the quantity for subsequent stock splits, with Settlement Date values of $11,380.82, $12,675.00 and $17,186.96. D.I. 27 at 15.

38.  On or about August 5, 2015, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 15.

39.  Mr. Nolan ultimately received 1,003 shares of common stock of Berkley pursuant to the 2015 RSU Agreement, after adjusting the quantity for subsequent stock splits, with Settlement Date values of $11,255.40, $15,312.85 and $13,862.30. D.I. 27 at 15-16.

40.  On or about August 5, 2016, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 16.

41.  Mr. Nolan ultimately received 1,057 shares of common stock of Berkley pursuant to the 2016 RSU Agreement, after adjusting the quantity for subsequent stock splits, with Settlement Date values of $16,135.63, $14,607.14 and $16,900.65. D.I. 27 at 16.

42.  On or about August 15, 2017, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 16.

43.  Mr. Nolan ultimately received 655 shares of common stock of Berkley pursuant to the 2017 RSU Agreement, after adjusting the quantity for subsequent stock splits, with Settlement Date values of $13,354.68 and $16,255.68. D.I. 27 at 17.

44.  On or about August 15, 2018, Mr. Nolan executed and entered into a subsequent RSU Agreement with Berkley. D.I. 27 at 17.

45.  Mr. Nolan ultimately received 343 shares of common stock of Berkley pursuant to the 2018 RSU Agreement, after adjusting the quantity for subsequent stock splits, with a Settlement Date value of $16,999.08. D.I. 27 at 17.

46. All together, Mr. Nolan received a total of 8,120 shares of common stock of Berkley, after adjusting the quantity for subsequent stock splits, with a total value of $283,016.60 on the applicable vesting/settlement dates. D.I. 27 at 17.

47. The 2017 RSU Agreement amended and superseded all prior RSU Agreements with Mr. Nolan, making the relevant language of the 2017 RSU Agreement the operable language for all of Berkley's prior RSU Agreements with Mr. Nolan. *See* Ex. A, 2017 RSU Agreement § 18, Berkley000053; Trial Tr. Vol I. at 25:8-15. Specifically, the 2017 RSU Agreement provides:

> This Agreement . . . supercede[s] all prior agreements, correspondence and understandings and all prior and contemporaneous oral agreements and understandings, among the parties hereto with regard to the subject matter hereof. As additional consideration for the grant of Restricted Stock Units made pursuant to this Agreement, the parties agree that the provisions in Sections 3(b), (d), (e), (f), (g), and (h); Section 12; Section 14; Section 16; Section 18; Section 19; Section 22; Section 23; and Exhibit B of this Agreement shall supersede and replace, and be substituted for inconsistent provisions (and, for new provisions herein, added to the covenants and obligations) in any previous restricted stock unit award agreements between Grantee [Mr. Nolan] and the Company, including for the avoidance of doubt any dispute resolution provisions therein, whether the awards under those agreements have vested or are unvested.

Ex. A, 2017 RSU Agreement § 18, Berkley000053. The relevant provisions of the 2018 RSU Agreement (i.e., those defining Competitive Action, etc.) are identical or nearly identical to those in the 2017 RSU Agreement. Ex. A, Berkley000076-82. All references herein to the language of the 2017 RSU Agreement is thus applicable to the 2018 RSU Agreement.

48. Regarding recapture, the 2017 RSU Agreement provides:

> The Restricted Stock Units granted hereunder shall be subject to the following forfeiture, recapture and other remedial provisions as provided below: . . . B. In the event that the [Compensation] Committee determines that the Grantee, (1) . . . within one year following Grantee's termination of employment for any reason, has engaged in a Competitive Action or has entered into an agreement (written, oral or otherwise) to engage in a Competitive Action . . . the Grantee shall pay to the Company, upon demand by the Company, an amount equal to

8

(i) the value, as of the Settlement Date (as defined below), of the number of shares of Stock delivered to the Grantee with respect to the Restricted Stock Units, and (ii) the value of all dividends, if any, paid to the Grantee in respect of the shares of Stock delivered to the Grantee on the Settlement Date. The Grantee may satisfy the payment obligation to the Company of the portion due under (i) above by returning the shares delivered to the Grantee on the Settlement Date, provided that any amounts due under (ii) above must be remitted to the Company in addition to the return of the shares.

Ex. A, 2017 RSU Agreement, § 3(d), Berkley000048-49.

49. The 2017 RSU Agreement defines "Company" as W. R. Berkley Corporation. Ex. A, 2017 RSU Agreement, Berkley000047.

50. The 2017 RSU Agreement defines "Restricted Period" as "the period beginning on the date [of the RSU Agreement] and ending one year following Grantee's termination of employment for any reason." Ex. A, 2017 RSU Agreement § 3(d)(D), Berkley000049.

51. The 2017 RSU Agreement provides that Mr. Nolan has engaged in a "Competition Action" if:

either directly or indirectly, and whether as an employee, consultant, independent contractor, partner, joint venturer or otherwise, the Grantee . . . (ii) who was employed by, or previously employed by, a subsidiary or subsidiaries of the Company, engages in or directs any business activities, except those which are ministerial or clerical in nature, which are competitive with any business activities conducted by such subsidiary or subsidiaries, in or directed into any geographical area (x) where Grantee had responsibilities on behalf of such subsidiary or subsidiaries or about which Grantee received Confidential Information and (y) in which the subsidiary/subsidiaries is or are engaged in business at the relevant time of enforcement . . . .

Ex. A, 2017 RSU Agreement § 3(e), Berkley000049-50.

52. The RSU Agreements have no requirement that there be any attempted or actual diversion of customers or business by Mr. Nolan for a Competitive Action to occur. Ex. A, 2017 RSU Agreement; Trial Tr. Vol. I at 72:11-15.

53. The RSU Agreements have no requirement that Berkley sustain any harm or damage resulting from Mr. Nolan's activities for a Competitive Action to occur. Ex. A, 2017 RSU Agreement; Trial Tr. Vol. I at 72:16-18.

54. The RSU Agreements have no requirement that Mr. Nolan impermissibly use Berkley's confidential information for a Competitive Action to occur. Ex. A, 2017 RSU Agreement; Trial Tr. Vol. I at 75:16-76:5.

55. Regarding the determination of Competitive Action, the 2017 RSU Agreement provides:

> The determination as to whether the Grantee has engaged in a Competitive Action shall be made by the Committee in its sole and absolute discretion. The Committee has sole and absolute discretion to determine whether, notwithstanding its determination that Grantee has engaged in a Competitive Action, recapture or forfeiture as provided herein shall not occur.

Ex. A, 2017 RSU Agreement § 3(e), Berkley000050.

56. Regarding governing law and judicial review, the 2017 RSU Agreement provides:

> This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of law thereof. . . . In any action arising under or relating to this Agreement, the court shall not have the authority to, and shall not, conduct a *de novo* review of any determination made by the Committee or the Company but is instead authorized to determine solely whether the determination was the result of fraud or bad faith under Delaware law.

Ex. A, 2017 RSU Agreement § 19, Berkley000053-54.

57. Mr. Nolan read and understood the RSU Agreements at the time he either signed them or accepted them electronically. Trial Tr. Vol. I at 231:22-232:8.

**C.    Mr. Nolan's Voluntary Termination Of Employment With Berkley Surety**

58. On December 16, 2021, Mr. Nolan informed Andrew Tuma ("Mr. Tuma"), President of Berkley Surety, that Mr. Nolan was resigning from Berkley Surety and joining Zurich

American Insurance Company ("Zurich") as Head of the Large Contract Division. Ex. A, Berkley000002; Trial Tr. Vol. I at 220:17-24.

59. Mr. Nolan testified that, in response, Mr. Tuma did not express concern about Mr. Nolan joining Zurich in such role. Trial Tr. Vol. I at 220:17-221:8.

60. On December 16, 2021, Mr. Nolan also informed Vincent Forte ("Mr. Forte"), Chief Operating Officer of Berkley Surety, that Mr. Nolan was resigning from Berkley Surety and joining Zurich as Head of the Large Contract Division. Ex. A, Berkley000002; Trial Tr. Vol. I at 221:9-14.

61. Mr. Nolan testified that, in response, Mr. Forte did not express concern about Mr. Nolan joining Zurich in such role. Trial Tr. Vol. I at 221:9-222:3.

62. On December 16, 2021, Mr. Nolan also informed Amanda LaPlatte ("Ms. LaPlatte"), Manager of Human Resources at Berkley Surety, that Mr. Nolan was resigning from Berkley Surety. Ex. A, Berkley000002;  Trial Tr. Vol. I at 222:4-12.

63. Mr. Nolan testified that, in response, Ms. LaPlatte did not express concern about Mr. Nolan joining Zurich in such role. Trial Tr. Vol. I at 222:4-16.

64. Later on December 16, 2021, Mr. Nolan e-mailed Ms. LaPlatte to confirm his resignation and, in that e-mail, Mr. Nolan stated that his last day of employment would be December 31, 2021. Ex. A, Berkley000020.

65. On December 31, 2021, Mr. Nolan completed his last day at Berkley Surety. D.I. 27 at 14.

66. On February 11, 2022, Nancy Micale ("Ms. Micale"), Assistant Vice President of Human Resources Shared Services at Berkley, sent a letter by USPS and e-mail to Mr. Nolan reminding or notifying Mr. Nolan of (1) his obligation under the RSU Agreements to advise Berkley of certain details of any new employment that Mr. Nolan might take within one year

11

of his termination from Berkley Surety, (2) his non-competition obligations post-termination under the RSU Agreements, (3) his ongoing confidentiality obligations, and (4) Berkley's reservation of right to pursue any and all legal or equitable remedies against Mr. Nolan for violation of his post-employment obligations. Ex. A, Berkley000011-12. While Ms. Micale wrote the letter, Nancy Tejeda ("Ms. Tejeda"), Data Compliance and Benefits Administrator at Berkely, sent the e-mail attaching the letter. Ex. S.

67. On February 24, 2022, Mr. Nolan sent an e-mail to Ms. Micale and Ms. Tejeda in response, wherein Mr. Nolan explained that he would be managing the large contract division at Zurich, which he "defined as construction clients maintaining aggregate, cost to complete work programs in excess of $400,000,000.00 (Four Hundred Million Dollars)." Ex. S.

68. On February 24, 2022, Ms. Micale sent a reply e-mail thanking Mr. Nolan for providing Berkley with this information. Ex. S.

69. In September 2022, Ms. Micale retired from Berkly; Ms. Tejeda was still employed by Berkley at all relevant times. Trial Tr. Vol. I at 187:16-23.

**D.    Mr. Nolan's Employment With Zurich**

70. Within 12 months after Mr. Nolan resigned from his role at Berkley Surety, he began employment at Zurich as its Head of the Large Contract Surety Division. D.I. 27 at 18.

71. On February 11, 2022, Zurich issued a press release reporting Mr. Nolan's new position at Zurich. Specifically, that press release states:

> As a leading provider of surety solutions for a wide range of customer needs, Zurich U.S. National Accounts is pleased to announce two leadership appointments that further strengthen our market position and growth in this critical line of business.
>
> Chris Nolan has joined Zurich as Head of Large Contract Surety, effective January 4. He is based in New Jersey, reporting to Robert Murray, Zurich U.S. National Accounts Head of Surety.

> Drawing upon more than 22 years in the business, Nolan brings to Zurich broad knowledge and experience in contact and commercial surety through former roles with the surety teams at Berkley and Chubb. Most recently, he was Berkley Surety's Chief Risk Officer and Head of Commercial Surety.
>
> . . .
>
> [Mr. Nolan and the other new hire's] knowledge and collaborative leadership styles will help sustain and grow the significant contributions our Surety teams continue to make on behalf of Zurich, our brokers and our customers.

Ex. A, Berkley000028-29.

72. Zurich is the third largest surety provider in the United States. Ex. A, Berkley000032.

73. Zurich has four divisions, including (1) a Large Contract Surety Division, which focuses on constructions accounts with minimum work programs of $400 million, (2) a Core Contract Surety Division, which is a construction segment of U.S. accounts with work programs below $400 million, (3) a Commercial Surety Division, which focuses on nonconstruction accounts within the United States, and (4) a Canadian Surety Division, which is a mix of the previous three divisions, but in Canada.  D.I. 34, 7/17/2024 Trial Transcript Vol. II ("Trial Tr. Vol. II") at 6:18-7:4.

74. Zurich's website includes the following information:

> The surety division is the "third largest and longest continuously operating surety provider in the United States," and its business is divided into two lines of surety bonds: contract and commercial.  The contract bonds focus on construction projects including private construction and public works. The commercial bond business "span[]s nearly every industry and include[s] Fortune 2000 and regional companies." Zurich provides surety bonds in all fifty states, the U.S. territories, and approximately twenty-five countries including Canada.

Ex. A, Berkley000030-35.

75. Zurich offers contract surety bonds to contractors ranging from small to large Engineering News-Record ("ENR") 400 firms. Ex. A, Berkley000033.

76. Zurich's Large Contract Surety Division provides an array of products to contractors performing a wide range of public works projects as well as private construction projects. Ex. A, Berkley000029.

77. In his role as Head of the Large Contract Surety Division at Zurich, Mr. Nolan's business activities geographically cover the entire United States. Trial Tr. Vol. II at 17:19-22.

78. In this role at Zurich, Mr. Nolan's home office is in New Jersey. Ex. A, Berkley000026, Berkley000028.

79. In this role at Zurich, Mr. Nolan services accounts with bond programs in excess of $400 million. Trial Tr. Vol. I at 251:1-4.

80. In this role at Zurich, Mr. Nolan only issues, or oversees the issuing of, contract and commercial surety bonds below $400 million for existing contract clients with more than $400 million in bonds. Trial Tr. Vol. I at 236:10-238:1, 240:18-23; Trial Tr. Vol. II at 8:23-9:6.

81. Consistent with Mr. Nolan's experience, at Zurich, there is limited overlap where the Commercial Surety Division issues contract surety bonds for commercial clients and the Contract Surety Division issues commercial surety bonds for contract clients. Trial Tr. Vol. I at 238:2-12.

82. Robert Murray ("Mr. Murray"), who was the Head of Surety at Zurich when Mr. Nolan first became employed there, expected Mr. Nolan to refer inquiries concerning surety programs of, for example, $150 million, even for clients with other programs exceeding $400 million, to other divisions within Zurich. Trial Tr. Vol. II at 20:9-19, 21:2-6.

83. Mr. Murray believes that Zurich's Core Contract Surety Division periodically competes with Berkley Surety. Trial Tr. Vol. II at 22:12-17.

14

84. Mr. Nolan has zero involvement with the Core Contract Surety Division of Zurich. Trial Tr. Vol. I at 213:3-17.

85. Mr. Nolan has zero involvement with the Canadian Surety Division of Zurich. Trial Tr. Vol. II at 24:14-18.

86. Mr. Nolan has zero involvement with the Commercial Surety Division of Zurich. Trial Tr. Vol. I at 205:6-14.

87. Mr. Nolan has zero involvement with the business activities of Chris Edwards ("Mr. Edwards"), Head of the Commercial Surety Division at Zurich. Trial Tr. Vol. I at 215:4-15.

88. Zurich's Commercial Surety Division issues commercial surety bonds in the range of $50 million to $150 million. Trial Tr. Vol. II at 18:19-19:1, 21:15-21.

**E.    The Compensation Committee's Decision**

89. On September 13, 2022, the Compensation Committee held a meeting to discuss *inter alia* whether Mr. Nolan's business activities at Zurich constituted a Competitive Action in violation of his RSU Agreements. D.I. 27 at 18.

90. At this time, the Compensation Committee comprised three (3) independent directors of Berkley, and all three (3) of them were present at and participated in the September 13, 2022 meeting. D.I. 27 at 18.

91. The three independent directors were Mary Farrell (Chairperson), Mark Brockbank, and Ronald Blaylock. D.I. 27 at 18.

92. Ms. Farrell receives annual compensation totaling approximately $345,000.00 for her role on Berkley's Board. Trial Tr. Vol. I at 30:24-31:20.

93. Ms. Farrell has never sold a surety bond and is not familiar with the day-to-day activities of Berkley Surety. Trial Tr. Vol. I at 32:2-14, 32:24-33:1.

15

94. Approximately one week prior to the scheduled meeting, the members of the Compensation Committee received a 191-page information packet (the "Packet") to assist their determination of whether Mr. Nolan engaged in a Competitive Action. Ex. A, Berkley000001-191; Trial Tr. Vol. I at 21:9-19.

95. The Packet contained:

   a. An introductory document containing *inter alia* "Questions presented" with respect to whether Mr. Nolan engaged in a Competitive Action, a summary of Mr. Nolan's employment at Berkley Surety, and a summary of the business of Berkley Surety and Zurich (Ex. A, Berkley000001-2);

   b. An index of the material in the Packet (Ex. A, Berkley000003);

   c. A September 13, 2022 Memorandum from Adam S. Mocciolo ("Mr. Mocciolo"), Assistant Vice President & Counsel at Berkley, excerpting the relevant RSU Agreement provisions (Ex. A, Berkley000004-5);

   d. A September 13, 2022 Memorandum from Mr. Mocciolo discussing *inter alia* Mr. Nolan's roles at Berkley Surety, Mr. Nolan's termination, and information on Zurich (Ex. A, Berkley000006-7);

   e. A "Comparative Business Overview" illustrating similarities between Berkley Surety and Zurich with respect to surety products, surety clients, surety industries, and geographic range (Ex. A, Berkley000008);

   f. A "Direct Premium Comparison" of Berkley Surety and Zurich (Ex. A, Berkley000009);

   g. A chart depicting the value of the RSU shares (Ex. A, Berkley000010);

   h. The February 11, 2022 letter to Mr. Nolan from Ms. Micale reminding Mr. Nolan of his obligations arising under the RSU Agreements (Ex. A, Berkley000011-12);

16

i.  Return receipts (Ex. A, Berkley000013-15);

j.  A September 13, 2022 Memorandum from Carol LaPunzina ("Ms. LaPunzina"), Senior Vice President of Human Resources at Berkley Surety, describing Mr. Nolan's termination (Ex. A, Berkley 000016);

k.  E-mail exchanges between Ms. LaPlatte and Mr. Mocciolo and others regarding Mr. Nolan and his new role at Zurich (Ex. A, Berkley000017-20), including an e-mail that Ms. LaPlatte had forwarded from Mr. Nolan, wherein Mr. Nolan confirmed his resignation (Ex. A, Berkley000020);

l.  A "Position Summary" describing Mr. Nolan's responsibilities at Berkley Surety and Zurich (Ex. A, Berkley000021);

m.  A "Berkley Surety Job Description" stating Mr. Nolan's responsibilities prior to termination in connection with the commercial surety division (Ex. A, Berkley000022-24);

n.  Confidential information to which Mr. Nolan either regularly received or had access (Ex. A, Berkley000025) (that confidential information is listed in ¶ 27);

o.  A copy of Mr. Nolan's LinkedIn Profile when he was employed at Zurich (Ex. A, Berkley000026-27);

p.  The February 11, 2022 Zurich Press Release (Ex. A, Berkley000028-29);

q.  A summary of Zurich (Ex. A, Berkley000030);

r.  Printouts of webpages from Zurich (Ex. A, Berkley000031-35);

s.  A summary of Berkley Surety (Ex. A, Berkley000036);

t.  Printouts of webpages from Berkley Surety (Ex. A, Berkley000037-43);

u. A resolution upon which the Compensation Committee would vote stating that Mr. Nolan engaged in a Competitive Action (Trial Tr. Vol. I at 69:7-18, 69:24-70:6; Ex. A, Berkley000044-45);

v. The relevant RSU Agreements (Ex. A, Berkley000046-155); and

w. Case law (Ex. A, Berkley0000156-191).

96. Of the 191 pages in the Packet, 146 pages consist of various RSU Agreements and prior *Berkley* legal opinions. Ex. A, Berkley000046-191; Trial Tr. Vol. I at 34:20-35:8, 35:15-21, 36:15-24.

97. The Packet did not include any memorandums from Mr. Tuma or Jeffrey Hafter ("Mr. Hafter"), Executive Vice President of Berkley and Mr. Tuma's boss. Ex. A, Berkley000001-191; Trial Tr. Vol. I at 37:6-15. The Packet did state that Mr. Hafter "confirmed that Berkley Surety and Zurich compete in similar markets, and that Zurich Insurance Group competes with other W. R. Berkley Corporation subsidiaries in surety markets outside of the United States." Ex. A, Berkley000002. The Packet also stated that "Mr. Tuma and Mr. Forte were able to supplement Mr. Nolan's information regarding the new position based on their knowledge of the security markets and Zurich's business, and from their knowledge of how similar surety underwriting responsibilities are carried out at Berkley Surety." Ex. A, Berkley00002.

98. The Packet did not include Mr. Nolan's February 24, 2022 e-mail to Ms. Micale and Ms. Tejeda, wherein Mr. Nolan described his new role at Zurich. Ex. A, Berkley00001-191; Trial Tr. Vol. I at 28:5-9.

99. The Compensation Committee reviewed the Packet in advance of the meeting and came prepared to discuss the materials in the Packet, including the requirements under the RSU Agreements. Trial Tr. Vol. I at 21:20-22:6.

100. At the September 13, 2022 meeting, the Compensation Committee walked through and discussed each section of the Packet and each of the requirements under the RSU Agreements for "Competitive Action." Trial Tr. Vol I. at 22:7-24:7.

101. Prior to making its determinations, Philip S. Welt ("Mr. Welt"), Executive Vice President President-General Counsel and Secretary of Berkley, reminded the Compensation Committee of the critical importance when considering whether any breach of a RSU Agreement had occurred to evaluate each individual based solely on their own facts and circumstances and to not draw any inference that a former employee may have breached one or more of the provisions of the RSU Agreements because the matter was being presented to the Committee. Ex. B, Berkley000471.

102. In making its determinations, the Compensation Committee considered and applied the terms of the RSU Agreements. Trial Tr. Vol. I at 24:14-16, 81:9-16.

103. In making its determinations, the Compensation Committee drew inferences from the facts. Trial Tr. Vol I. at 72:19-21.

104. In making its determinations regarding the business activities of Zurich, the Compensation Committee primarily relied on Zurich's website, including Zurich's press release about its hire of Mr. Nolan. Trial Tr. Vol. I at 62:23-63:1, 63:14-17, 64:1-15.

105. The Compensation Committee could have requested additional information from others to assistant their determination. Trial Tr. Vol I. at 23:1-6.

106. The Compensation Committee could have met with others to assist their determination.  Trial

Tr. Vol I. at 39:1-12.

107. The Compensation Committee unanimously determined:

> that through Nolan's employment with Zurich North America, including as its
> Head of Large Contract Surety, he has directly or indirectly engaged in and
> directed, within the Restricted Period as defined in section 3(d) of the
> Agreements, business activities that are competitive with the business activities
> of the Company's subsidiary by which Nolan was employed

and

> that Nolan's business activities on behalf of Zurich North America, excluding
> ministerial or clerical services, are taking place in or are directed into a
> geographical area (x) in which he had responsibilities on behalf of [Berkley's]
> subsidiary by which he was employed or about which he learned of or received
> Confidential Information as defined in section 3(h) of the Agreements, and (y)
> in which [Berkley's] subsidiary by which Nolan was employed is presently
> engaged in business[.]

D.I. 27 at 19.

108. The Compensation Committee made this determination in light of:

   a. the Committee's conclusion that Zurich has substantial overlap with Berkley Surety

   and the two companies compete for similar customers and similar business in the

   same geographic region (Trial Tr. Vol. I at 81:21-82:25);

   b. Mr. Nolan's position at Zurich and the conclusion that this position competes with

   Berkley Surety (Ex. B, Berkley000473; Trial Tr. Vol. I at 72:22-74:7);

   c. Mr. Nolan's position at Berkley Surety (Ex. B, Berkley000472); and

   d. Mr. Nolan's receipt of confidential information at divisions of Berkley Surety that

   compete with Zurich (Ex. B, Berkley000472-73).

109. The Compensation Committee made this determination notwithstanding the Committee's acknowledgement that Berkley Surety generally goes after a smaller market and Zurich generally goes after a larger market.  Trial Tr. Vol. I at 81:21-82:2.

110. The Compensation Committee resolved that Mr. "Nolan upon becoming employed by, and after employment with, Zurich North America as its Head of Large Contract Surety, within one year of the termination of his employment with Berkley Surety Group, [] breached terms set forth in the definition of Competitive Action as defined in Section 3(e)(ii) of the Agreements[.]" D.I. 27 at 19.

111. The Compensation Committee further resolved that "Nolan is required to (i) return to [Berkley] the shares delivered or pay to [Berkley] the monetary value of the shares delivered on the settlement date(s) (as adjusted for stock splits), and (ii) pay to [Berkley] the monetary value of all dividends paid to Nolan since the settlement or vesting date, as the case may be, pursuant to the Agreements[.]" D.I. 27 at 19.

112. In September 2022, Mr. Nolan received a letter dated September 15, 2022 from Mr. Mocciolo, wherein Mr. Mocciolo informed Mr. Nolan that the Compensation Committee had determined that Mr. Nolan had breached his obligations under the RSU Agreements and demanded the return of Mr. Nolan's RSU shares. Ex. O, Berkley000712-13.

113. This September 15, 2022 letter from Mr. Mocciolo was the first contact Mr. Nolan had received from Berkley since Ms. Micale sent Mr. Nolan a thank you e-mail on February 24, 2022 in response to Mr. Nolan informing Berkley of his new role at Zurich on February 24, 2022. Trial Tr. Vol. I at 225:18-25.

114. Upon learning of Mr. Nolan's February 24, 2022 letter, which had not been part of the original Packet, the Compensation Committee met again on February 23, 2023 and

determined, once again, that Mr. Nolan had engaged in a Competitive Action. Trial Tr. Vol. I at 27:13-30:11; Ex. C, Berkley000508-09.

115. In all Competitive Action cases brought before the Compensation Committee before Mr. Nolan's case, the Compensation Committee found Competitive Action. *See* Ex. Q, Berkley000243; Trial Tr. Vol. I at 65:13-66:17.

**F.    The Opinions Of Mr. Tuma And Mr. Hafter**

116. At all relevant times, Mr. Tuma did not see any evidence, information or documents showing that Mr. Nolan, when at Zurich, was competing with Berkley Surety. Trial Tr. Vol. I at 97:6-10.

117. At all relevant times, Mr. Tuma did not know of any business activity in which Mr. Nolan engaged at Zurich that competes with Berkely Surety. Trial Tr. Vol. I at 136:10-14.

118. At all relevant times, Mr. Tuma never directly spoke to the Compensation Committee about whether Mr. Nolan engaged in a Competitive Action. Trial Tr. Vol. I at 99:5, 138:3-139:11.

119. At all relevant times, Mr. Tuma testified that had he known that Mr. Nolan was competing with Berkley Surety, he would have informed Berkley. Trial Tr. Vol. I at 100:3-7.

120. At all relevant times, Mr. Hafter had no knowledge or information to suggest that Mr. Nolan was competing with Berkley Surety in his role at Zurich. Trial Tr. Vol. I at 150:20-22.

121. At all relevant times, Mr. Hafter did not know of any business activity in which Mr. Nolan engaged at Zurich that competes with Berkely Surety. Trial Tr. Vol. I at 172:12-173:5.

122. At all relevant times, Mr. Hafter never directly spoke to the Compensation Committee about whether Mr. Nolan engaged in a Competitive Action. Trial Tr. Vol. I at 173:19-174:7.

**G.  Mr. Nolan's Failure To Repay Or Return The RSU Shares To Berkley**

123. Mr. Nolan has not returned the RSU shares to Berkley, paid Berkley the value of the RSU

shares, or paid Berkley for any dividends received from the RSU shares.  D.I 27 at 20.

## II.  PROCEDURAL HISTORY

On November 28, 2022, Berkley filed a complaint against Mr. Nolan alleging breach of

contract.  D.I. 1.  On June 26, 2024, the parties submitted a proposed final pretrial order, wherein

the parties stipulated to several facts (including several listed above).  D.I. 27 at 14-20.  On July

16, 2024 and July 17, 2024, the Court held a two-day bench trial.  D.I. 33; D.I. 34.  On August 5,

2024, Berkley submitted its proposed findings of fact and conclusions of law.  D.I. 32.  On August

19, 2024, Mr. Nolan submitted his proposed findings of fact and conclusions of law.  D.I. 35.

## III.  LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides: "In an action tried on the

facts without a jury or with an advisory jury, the court must find the facts specially and state its

conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "The classical statement of the burden

of proof in an ordinary civil case such as this is that the facts must be proved by a 'preponderance

of the evidence.'"  *Burch v. Reading Co.*, 240 F.2d 574, 578 (3d Cir. 1957).  It is within the

province of the district court as the finder of fact to "make subjective credibility determinations

about the witnesses who testified."  *Bayer AG v. Housey Pharms., Inc.*, 386 F. Supp. 2d 578, 580

(D. Del. 2005), *aff'd*, 189 F. App'x 969 (Fed. Cir. 2006).

## IV.  DISCUSSION

In this action, Berkley contends that Mr. Nolan's business activities as Head of the Large

Contract Surety Division at Zurich constitute a Competitive Action in violation of Mr. Nolan's

RSU Agreements with Berkley.  Berkley further contends that, under the RSU Agreements, such

violation obligates Mr. Nolan to (1) return his RSU shares to Berkley or pay Berkley an amount equal to the value of the RSU shares and (2) pay Berkley the value of any dividends that Mr. Nolan received in connection with his RSU shares. Berkley further contends that Mr. Nolan did not perform these payment obligations and thus seeks remedy.

As both parties observe (D.I. 32 at 17; D.I. 35 at 21), the 2017 RSU Agreement provides that the Compensation Committee has "the sole and absolute discretion to determine whether Mr. Nolan engaged in a Competitive Action." FF, Section B ¶ 55. Per this discretion, the Compensation Committee determined that Mr. Nolan engaged in a Competitive Action. FF, Section E ¶ 107. The 2017 RSU Agreement further provides that this Court may only overcome the Compensation Committee's decision by determining that the Compensation Committee's decision was the result of either fraud or bad faith. FF, Section B ¶ 56. Here, Mr. Nolan contends that the Compensation Committee's decision was the result of bad faith (but not fraud). D.I. 35 at 21.

In this discussion, the Court: (A) confirms that the recapture provisions of the 2017 RSU Agreement are enforceable; (B) concludes that the Compensation Committee's decision that Mr. Nolan engaged in a Competitive Action was not made in bad faith; (C) concludes that Mr. Nolan breached the RSU Agreements; and (D) discusses damages.

## A.      The Recapture Provisions Are Enforceable

Both parties agree that the recapture provisions of the RSU Agreements are enforceable. D.I. 32 at 16; D.I. 35 at 21. Nonetheless, the Court will briefly examine enforceability.

The courts of Delaware "hold freedom of contract in high—some might say, reverential—regard." *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676 (Del. 2024). Delaware courts will only "ignore unambiguous contractual undertakings" if such "is required to vindicate a public

24

policy interest even stronger than freedom of contract." *Id.* at 677.[1]  In *Cantor*, the Delaware Supreme Court held that "public-policy considerations weigh in favor of enforcing" recapture provisions between "sophisticated parties . . . in a limited partnership agreement." *Id.* at 692.

The Third Circuit in *Dunai* subsequently relied on *Cantor* to likewise affirm that a recapture provision is "not subject to the reasonableness review applicable to restraints of trade and is enforceable as a bargained-for provision in agreements struck by sophisticated parties." *W. R. Berkley Corp. v. Dunai ("Dunai II")*, No. 22-2963, 2024 WL 511040, at *3 (3d Cir. Feb. 9, 2024) (nonprecedential).[2]  The recapture provisions and underlying facts in *Dunai* were nearly identical to those present here. *See id.* at *1 ("Julie Dunai, a corporate vice president, received more than $200,000 in stock benefits from her former employer, a subsidiary of insurance company W. R. Berkley Corporation. But the agreements providing for those benefits included a clawback provision providing that if Dunai engaged in competitive activity within a year of terminating her employment, the company could demand return of the stock or a payment for its value. . . . Dunai left Berkley and joined another insurance company within a year of her departure. The Compensation Committee determined this constituted competitive activity under the agreements and demanded Dunai return the stock or pay for its value. She refused, and Berkley sued. The District Court granted summary judgment in its favor. On appeal, Dunai challenges the judgment of that Court on various grounds. Her primary argument is that the clawback provision is unreasonable and unenforceable. For the reasons that follow, it is not, and we affirm.").

---

[1] The 2017 RSU Agreement provides that Delaware law governs (FF, Section B ¶ 56) and neither party contends otherwise.

[2] While *Dunai* is nonbinding, *see id.* at 1 n.**, it "provide[s] guidance and persuasive reasoning," *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. 18-cv-362-RGA, 2019 WL 7037656, at *4 (D. Del. Dec. 20, 2019).

Notably, the defendant in *Dunai* contended that *Cantor* was distinguishable, because in *Cantor* the recapture "provision featured in a limited partnership agreement, which [was] not the case" for the defendant in *Dunai*. *Id.* at \*3 n.3. The Third Circuit, however, found such distinction unpersuasive and applied the holding from *Cantor* to conclude that recapture provisions are "enforceable" even outside the context of limited partnership agreements. *Id.* at \*3 & n.3.

Accordingly, the recapture provisions here (FF, Section B ¶ 48), like those in *Dunai*, are "not subject to the reasonableness review applicable to restraints of trade and [are] enforceable as [] bargained-for provision[s] in agreements struck by sophisticated parties." *See Dunai II*, 2024 WL 511040, at \*3. Mr. Nolan does not contest that he is a sophisticated party. *See* D.I. 35.

The Court observes, however, that an opinion from the Delaware Supreme Court may impact this analysis. *See, e.g.*, *LKQ Corp. v. Rutledge*, 96 F.4th 977, 986-87 (7th Cir. 2024) (certifying to the Delaware Supreme Court the questions of (1) whether "*Cantor Fitzgerald* precludes reviewing forfeiture-for-competition provisions for reasonableness in circumstances outside the limited partnership context" and (2) if "*Cantor Fitzgerald* does not apply in all other circumstances, what factors inform its application? For example, does it matter what type of agreement the forfeiture provision appears in, how sophisticated the parties are, whether the parties retained counsel to review the provision, whether the forfeiture involves a contingent payment or claw back, how far backward a claw back reaches, whether the employee quit or was involuntarily terminated, or whether the provision also entitled the company to injunctive relief?").

**B.    Berkley Did Not Act In Bad Faith By Determining That Mr. Nolan Violated The Underlying RSU Agreements**

As described above, the 2017 RSU Agreement provides:

> In any action arising under or relating to this Agreement, the court shall not have the authority to, and shall not, conduct a *de novo* review of any determination made

26

by the Committee or the Company but is instead authorized to determine solely whether the determination was the result of fraud or bad faith under Delaware law.

FF, Section B ¶ 56. Thus, the Court will not conduct a *de novo* review of the Compensation Committee's decision that Mr. Nolan engaged in a Competitive Action; instead, the Court will assess whether the Compensation Committee's decision was the result of bad faith. *See W. R. Berkley Corp. v. Hall*, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005) (only considering whether the committee's decision was the result of bad faith).

Under Delaware law, Mr. Nolan bears a heavy burden to establish bad faith. *See W.R. Berkley Corp. v. Dunai ("Dunai I")*, No. 1:19-cv-01223-SB, 2022 WL 4535659, at *2 (D. Del. Sep. 28, 2022). Bad faith "requires scienter," and in particular that the Compensation Committee (1) was "motivated by an actual intent to do harm or (2) committed an intentional dereliction of duty," i.e., "a conscious disregard for [its] responsibilities." *Id.* (citation omitted). Something more "than gross negligence" or "unreasonableness" is required. *Id.* (citation and internal quotations omitted). Here, Mr. Nolan fails "to make an adequate showing" of bad faith since he said "nothing about the Committee's state of mind (i.e., scienter)." *See id.* In particular, Mr. Nolan fails to establish that the Compensation Committee was "motivated by an actual intent to do harm or (2) committed an intentional dereliction of duty." *See id.* (citation and internal quotations omitted).

In an attempt to satisfy this standard, Mr. Nolan raises three categories of contentions to support a finding of bad faith, including that the Compensation Committee (1) made an incorrect decision, (2) exercised inadequate procedures, and (3) failed to consider sufficient information.[3]

---

[3] Mr. Nolan does not specify these three categories precisely. Instead, the Court specifies them to facilitate the presentation of this Opinion.

Mr. Nolan fails to establish bad faith through each of these categories of contentions, however, for the reasons discussed herein.

**1.      Mr. Nolan Fails to Establish Bad Faith Through the Compensation Committee's Decision**

Incorrect decisions are not sufficient to establish bad faith. *See New Wood Res. LLC v. Baldwin*, No. N20C-10-231-SKR-CCLD, 2023 Del. Super. LEXIS 366, at *22 (Del. Super. Ct. July 31, 2023) (holding that a decision that is "just plain wrong" may not be sufficient to show bad faith). Both parties (D.I. 32 at 19; D.I. 35 at 27) cite *In Re Kraft* for the proposition that an incorrect decision may establish bad faith when the decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable." *In Re Kraft Heinz Demand Refused Derivative Stockholder Litigation*, No. 22-cv-0398-LWW, 2024 WL 3493957, at *8 (Del. Ch. July 19, 2024) (regarding a decision that allegedly violated the fiduciary obligations of a board of directors).

Insofar as this construction of bad faith extends to the circumstances here (and the Court does not hold that it does), the Compensation Committee's decision was not "so far beyond the bounds of reasonable judgment." *See id.* at *8.  Here, the Compensation Committee decided that Mr. Nolan engaged in a Competitive Action in light of: (1) the Committee's conclusion that Zurich and Berkley Surety substantially overlap; (2) Mr. Nolan's position at Zurich and that the position competes with Berkley Surety; (3) Mr. Nolan's position at Berkley Surety; and (4) Mr. Nolan's receipt of confidential information at divisions of Berkley Surety that compete with Zurich.  FF, Section E ¶ 108.

Mr. Nolan contends that the Compensation Committee improperly "focused on the alleged overlap between Berkley Surety and Zurich on the whole instead of" any overlap between Mr. Nolan's specific roles at each company.  D.I. 35 at 24, *see id.* at 23 (contending that Mr. Nolan was not involved with (1) the Commercial Division at Zurich, (2) the Core Contract Division at

Zurich, and (3) new accounts at Zurich involving a threshold that Berkley Surety could handle); *see also* FF, Section B ¶ 51 (providing than an overlap of *roles*, not *the business as a whole*, constitutes a Competitive Action).

While the Compensation Committee did consider the overlap between Berkley Surety and Zurich (FF, Section E ¶ 108), Mr. Nolan ignores the extent to which the Compensation Committee also considered the overlap between Mr. Nolan's specific roles at Zurich and Berkley Surety. FF, Section E ¶¶ 95, 108. Critically, while Mr. Nolan's role at Zurich involved contract surety bonds (FF, Section D ¶¶ 70-71), and while Mr. Nolan's primary role at Berkley Surety involved commercial surety bonds (FF, Section A, ¶¶ 15, 18-19), there are at least two sufficient bases for the Compensation Committee's decision of Competitive Action.

*First*, Mr. Nolan acted as Chief Risk Officer at Berkley Surety with respect to commercial *and* contract surety bonds. FF, Section A, ¶¶ 21-26. As such, there is conceivable overlap between Mr. Nolan's roles at each company, because both involve the issuance of contract surety bonds. *See* FF, Section B ¶ 51 (defining Competitive Action to include engagement in business activities that compete with business activities at Berkley Surety in which Mr. Nolan had responsibilities). *Second*, Mr. Nolan received confidential information with respect to both commercial *and* contract surety bonds at Berkley Surety. FF, Section A, ¶¶ 27-29. As such, there is again conceivable overlap between Mr. Nolan's business activities at Zurich and business activities at Berkley Surety in which he received confidential information. *See* FF, Section B ¶ 51 (defining Competitive Action to include engagement in business activities that compete with divisions of Berkley Surety of which Mr. Nolan received confidential information).

Moreover, it is possible that the Compensation "Committee could have—or even should have—decided that [Mr. Nolan's] new job was noncompetitive" (*Dunai I*, 2022 WL 4535659, at

29

\*2), since the Compensation Committee knew that Mr. Nolan oversaw the issuance of contract surety bonds at Zurich that exceeded $400 million (FF, Section C ¶¶ 66-67; FF, Section E ¶ 114) and presumably not bonds directly competing with the smaller contract surety bonds at Berkley Surety (FF, Section A ¶ 6). However, any alleged "gross negligence" or "unreasonableness" here falls "short of bad faith." *Dunai I*, 2022 WL 4535659, at \*2. To the extent that the Compensation Committee's decision was "ineffective," "obtuse," "harmful" or "just plain wrong," bad faith is not implicated. *Id.*; *New Wood Res. LLC*, 2023 Del. Super. LEXIS 366, at \*22.

2.      **Mr. Nolan Fails to Establish Bad Faith Through the Compensation Committee's Procedures**

The procedures exercised by the Compensation Committee to render a decision on whether Mr. Nolan engaged in a Competitive Action were sufficient to preclude a finding of bad faith. In *Dunai,* the Court determined that the following procedures of the compensation committee were, even if true, insufficient to constitute bad faith: (1) rubber stamping the recapture provision at issue; (2) making its decision in a "categorically unclear" manner; (3) not contacting the former employee during the decision process; (4) failing to realize that the former employee's new employment "could have been non-competitive"; and (5) reviewing "blank pages" in the packet upon which the committee relied to make its decision. *Dunai I*, 2022 WL 4535659, at \*2. The Court explained that these actions did not constitute bad faith; rather, these actions were "a series of shortcomings in the Committee's deliberations." *Id.* The Third Circuit agreed this "reasoning" and affirmed. *Dunai II*, 2024 WL 511040, at \*3.

As in *Dunai,* the procedures of the Compensation Committee flagged by Mr. Nolan here fail to establish bad faith. *First*, Mr. Nolan contends that the "Compensation Committee served as nothing more than a rubber stamp of the" information placed before it. D.I. 35 at 20 (quotation marks omitted). Such contention, however, is false. *See, e.g.* FF, Section E ¶ 99 (the Committee

reviewed the Packet prior to the meeting and came prepared to discuss the materials therein); FF, Section E ¶ 100 (the Committee walked through and discussed each section of the Packet); FF, Section E ¶ 101 (Mr. Welt reminded the Committee of the importance of evaluating each individual solely based on their own facts); FF, Section E ¶ 102 (the Compensation Committee considered and applied the terms of the RSU Agreements); FF, Section E ¶ 103 (the Compensation Committee drew inferences from the facts). In any event, as in *Dunai*, rubber stamping does not necessarily constitute bad faith. *See Dunai I*, 2022 WL 4535659, at *2.

*Second*, Mr. Nolan asserts that the Packet included a document prematurely concluding that "Mr. Nolan engaged in Competitive Action." D.I. 35 at 26. This contention, however, is misleading. The document that Mr. Nolan cites was a resolution upon which the Compensation Committee would vote stating that Mr. Nolan engaged in a Competitive Action. FF, Section E ¶ 95(u). Voting on a pre-written resolution is equally or even less probative of bad faith than rubber stamping and, as discussed in the previous paragraph, rubber stamping does not necessarily constitute bad faith. *See Dunai I*, 2022 WL 4535659, at *2.

*Third*, Mr. Nolan flags Ms. Farrell's testimony that "there is good reason to believe there [is] Competitive Action" by the time a matter for resolution comes to the attention of the Compensation Committee. D.I. 35 at 26. Mr. Nolan asserts that this testimony evidences bad faith. *Id.* While this testimony is conceivably probative of bad faith, the procedures that the Compensation Committee employed to determine whether Mr. Nolan engaged in a Competitive Action were sufficient to preclude bad faith. *See, e.g.*, FF, Section E ¶¶ 99-103. *Finally*, that the Compensation Committee had always previously found Competitive Actions in other cases (D.I. 35 at 20 (proposing this fact)), does not mean that the Compensation Committee's decision with respect to Mr. Nolan was the result of bad faith.

3.      **Mr. Nolan Fails to Establish Bad Faith Through the Information that the Compensation Committee Reviewed**

In *Dunai*, the Court held that reviewing "incomplete and inaccurate information" is insufficient to support a finding of bad faith. *Dunai I*, 2022 WL 4535659, at *2. Here, Mr. Nolan protests that "the vast majority of" substantive content that the Compensation Committee reviewed "was derived from internet sources or prepared by individuals from Berkley with whom Mr. Nolan did not work." D.I. 35 at 25-26. Similarly, Mr. Nolan observes that the Compensation Committee did not consider the opinions of Mr. Nolan's superiors, including Mr. Hafter and Mr. Tuma, who "both testified that they were unaware" of any Competitive Action. D.I. 35 at 25; *see* FF, Section F ¶¶ 116-22 (regarding opinions of Mr. Hafter and Mr. Tuma). Mr. Nolan raises that the Compensation Committee did not speak with him. D.I. 20 at 16. Mr. Nolan also suggests that the Compensation Committee failed to "conduct due diligence" and obtain enough information "to make a decision." D.I. 35 at 21-22. Finally, Mr. Nolan similarly contends that the Compensation Committee failed to "investigate or request additional information" regarding Mr. Nolan's roles and corresponding authority at the companies and Mr. Nolan's receipt or access of confidential information at Berkley Surety. D.I. 20 at 16-17. However, the Compensation Committee made its decision after reviewing a Packet that contained documents with enough information.

Indeed, those documents include: (1) a memorandum discussing Mr. Nolan's roles at Berkley Surety and information on Zurich; (2) a "Comparative Business Overview" between Berkley Surety and Zurich; (3) a "Position Summary" describing Mr. Nolan's responsibilities at Berkley Surety and Zurich; (4) a "Berkley Surety Job Description"; (5) confidential information of which Mr. Nolan either regularly received or had access to at Berkley Surety; (6) a press release from Zurich describing Mr. Nolan's new role at Zurich; and (7) various printouts from the webpages of Berkley Surety and Zurich. FF, Section E ¶ 95. Insofar as the Compensation

Committee reviewed incomplete or inaccurate information, moreover, such incomplete or inaccurate review does not constitute bad faith; rather, such review only constitutes a shortcoming "in the Committee's deliberations." *Dunai I*, 2022 WL 4535659, at \*2. Accordingly, any purported failure by the Compensation Committee (*see* D.I. 20 at 16-17) to investigate or request additional information falls short of bad faith.

**C.    Mr. Nolan Breached The Underlying RSU Agreements**

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, No. N19C-12-160-MMJ-CCLD, 2021 Del. Super. LEXIS 148, at \*17-18 (Del. Super. Ct. Feb. 4, 2021). As the party asserting breach of contract, Berkley bears the burden of establishing these elements by a "preponderance of the evidence." *Feenix Payment Sys., LLC v. Blum*, No. N21C-05-099-EMD-CCLD, 2024 Del. Super. LEXIS 434, at \*23-24 (Del. Super. Ct. May 29, 2024).

Here, the trial evidence confirms that Mr. Nolan breached the RSU Agreements. *First*, the contractual obligations exist. FF, Section B ¶¶ 30-56. *Second*, Mr. Nolan breached his obligations when he engaged in a Competitive Action (FF, Section E ¶ 107) and did not return his RSU shares or settlement value thereof, along with any corresponding dividends (FF, Section G ¶ 123). As determined in the prior Section, the Compensation Committee did not decide that Mr. Nolan engaged in a Competitive Action in bad faith, and thus this Court defers to the decision of the Compensation Committee (FF, Section E ¶ 107) to conclude that Mr. Nolan did engage in a Competitive Action.

Even were the Court to complete a *de novo* review on whether Mr. Nolan engaged in a Competitive Action, the Court's decision may have been consistent with the decision of the Compensation Committee, albeit for different reasons.

As Head of Large Contract Surety at Zurich, Mr. Nolan may oversee the issuance of commercial surety bonds below $400 million for Zurich's contract clients with more than $400 million in bonds. FF, Section D ¶ 80. In his previous role as Head of Commercial at Berkley Surety, Mr. Nolan oversaw the issuance of commercial surety bonds in amounts between $50 million and $150 million. FF, Section A, ¶¶ 6, 14, 18, 20. Since Mr. Nolan may oversee or oversaw the issuance of commercial surety bonds in amounts between $50 million and $150 million at both Zurich and Berkly Surety, the business activities in which Mr. Nolan directed at Zurich appear to at least occasionally compete with the business activities of Berkley Surety in which Mr. Nolan had responsibilities.

*Third*, Berkley suffered damages as a result of Mr. Nolan's breach. *See Bailey v. Tektronix, Inc.*, No. 21-cv-1268-GBW, 2022 U.S. Dist. LEXIS 163710, at *9 (D. Del. Sep. 12, 2022) (confirming that damages arise from the "failure to make payments due under the [applicable contract]").

## D.   Damages

In its proposed findings of fact and conclusions of law, Berkley contends that it "is entitled to recover (i) $283,016.60 (ii) prejudgment interest at 9% (Delaware legal rate as of date of filing of the Complaint calculated using the Federal Funds Rate of 4% plus 5% in accordance with 10 Del. C. §3901), (iii) post-judgment interest at the federal legal rate at the time of the entry of judgment, and (iv) costs." D.I. 32 at 20.

As to (i), the amount that Berkley seeks is consistent with the parties' stipulated facts (FF, Section B ¶¶ 32-46 (citing D.I. 27)), and the Court at this stage does not see any reason to diverge. While the recapture provision of the RSU Agreements alternatively allows for Mr. Nolan to return the RSU shares (FF, Section B ¶ 48), the Court understands that Mr. Nolan sold the shares shortly after acquiring them. Similarly, while the same provision also requires Mr. Nolan to pay Berkley the value of any dividends received for the RSU shares, the Court understands that Mr. Nolan did not receive any dividends because Mr. Nolan sold his shares shortly after acquiring them. As to (ii), Berkley has not provided developed argument on the amount of prejudgment interest, whether the interest should compound, and when the interest should begin to accrue. Accordingly, the Court will order the parties to meet and confer on the issues of damages and interest and file additional briefing, if necessary.

As to (iv), Berkley may file a bill of costs consistent with Local Rule 54.1.

## V.    CONCLUSION

For the reasons discussed above, the Court concludes that Mr. Nolan breached the terms of the RSU Agreements, and that the Compensation Committee did not determine that Mr. Nolan engaged in a Competitive Action in bad faith. The Court will enter an Order consistent with this Opinion.